Filed 5/9/23  In re K.H. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.H., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. D.H., Defendant and Appellant. | F085284 (Super. Ct. No. 03CEJ300235-3) **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Kimberly J. Nystrom-Geist, Judge.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Carlie Flaugher, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]  Before Detjen, Acting P. J., Meehan, J. and DeSantos, J.

In this juvenile dependency case involving now 17-year-old K.H.,[1] D.H. (father) appeals from the juvenile court's dispositional order. Father contends the court erred by (1) finding the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) did not apply to the proceedings because the Fresno County Department of Social Services (department) failed to make an adequate inquiry and provided incomplete notice; and (2) ordering as part of father's reunification case plan (a) a substance abuse assessment and recommended treatment and random drug testing and (b) a domestic violence assessment and recommended treatment. The department concedes ICWA inquiry error and that remand is appropriate for the limited purpose of ensuring ICWA compliance.

We reverse the juvenile court's order that father participate in random drug testing as part of his case plan. We accept the department's concession regarding ICWA and remand for proceedings to ensure ICWA inquiry compliance. In all other respects, the juvenile court's dispositional order is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

K.H. resided with his maternal great-grandfather and visited with father on the weekends. Mother also lived in the home with K.H. but was often gone for weeks at a time, returning only for days at a time. She was a methamphetamine user, and her whereabouts were unknown at the time this case was initiated. Mother and father reportedly had joint custody of K.H.

In April or May 2022, K.H. reported to father that the maternal great-grandfather had been sexually abusing him since he was seven years old, and he did not feel comfortable living with him anymore. Father was unsure if K.H. was lying and wanted

---

[1] The department's reports indicate that K.H.'s gender is female, but K.H.'s counsel indicated K.H. uses "he, him" pronouns. The record further indicates K.H. does not use his legal name; however, as it appears his preferred name has the same initials as his legal name, we refer to K.H. throughout this opinion by his initials for consistency and to protect his privacy. No disrespect is intended.

to investigate the matter. In talking to other family members, father learned that K.H.'s older sister had disclosed sexual abuse by the maternal great-grandfather in the past but it had been reported to law enforcement and the department and determined to be unfounded. Approximately two to three weeks after K.H. first disclosed the abuse to father, K.H. called father to report he woke up with the maternal great-grandfather standing over him and asked father to pick him up. Father did so and began to take K.H. to his home, but the maternal great-grandfather called father and threatened to call the police to report that father had kidnapped K.H. Father returned K.H. to the maternal great-grandfather's home. Approximately three to four days later, father reported the incident to law enforcement. Father told law enforcement he did not believe the maternal great-grandfather sexually abused K.H.

A referral was made to the department. K.H. told the investigating social worker that there is often no food in the home because mother does not provide for him financially. He reported father had provided food, supplies, and clothing in mother's absence. K.H. further reported being depressed, missing over 200 days of school, engaging in self-harm, and previously contemplating suicide, once when mother was missing for over a month, and again when mother told K.H. she would put him up for adoption. K.H. stated he never got along with mother and wanted to live with father.

Father told the investigating social worker he did not report the abuse sooner because of his distrust for the legal system. He had not attempted to file a request for a change in custody because during the original custody battle, which occurred when K.H. was approximately three years old, mother falsely reported father had hit her. Father expressed that the department had been called to check on K.H. before but nothing was done, and it was the department's "fault [K.H.] ha[d] been unprotected, not his." Father denied having domestic violence concerns, other than being a victim of domestic violence by mother. He reported he left mother and K.H. after mother had assaulted him

3.

and they had been verbally arguing in front of K.H. when he was small. Father reported he left because he did not want K.H. exposed to violence.

A team decision making (TDM) meeting was held. Mother, who had since been located, and father both attended. Father reported using marijuana and no other substances. Mother reported she is not often home because she feels uncomfortable there. She reported the physical conditions of the home were poor and it was " 'like living in hell.' " She had tried getting K.H. to leave with her but was unsuccessful. Mother reported she did not want to believe K.H.'s disclosures about the maternal great-grandfather but had heard other family members, including her other child, had been molested by him. The department determined it was not safe for K.H. to return to either parent's care. After the meeting, father went to the drug testing facility but was unable to provide a sample due to a medical condition. K.H. was placed in a foster home.

The department filed a juvenile dependency petition, alleging K.H. came within the court's jurisdiction under Welfare and Institutions Code[2] section 300, subdivisions (b)(1) [failure to protect], (c) [serious emotional damage], (d) [sexual abuse], and (j) [abuse of sibling]. The jurisdictional allegations as to father were under section 300, subdivisions (b)(1), (c), and (d) and alleged he failed to protect K.H. by knowing of the sexual abuse and returning him to his abuser and failing to timely report it to the authorities.

The department's detention report dated May 16, 2022, indicated that on May 13, 2022, father and mother reported they do not have any Native American ancestry.

The detention hearing was held on May 17, 2022, and May 18, 2022.[3] On May 17, both parents were present. The juvenile court asked mother if her family had

---

[2] All further undesignated statutory references are to the Welfare and Institutions Code.

[3] The hearing was held over two days because mother was having technical difficulties on May 17, and father was only available on May 17.

4.

Native American or American Indian heritage. Mother indicated her father was adopted off a reservation with a biological sister, and she had started looking into his family name, which may have been "Hazel" or "Nobal-Randal." She reported her father was Winnebago Indian, and her mother had Blackfeet and Cherokee ancestry. She further reported both her parents were still living and provided their full names on the record.

The juvenile court then asked father whether he had Native American or American Indian heritage. Father responded that his great-grandmother was "full-blooded Choctaw from Oklahoma," but he did not have any enrollment numbers. Father provided a first and last name for her but indicated she passed away when he was very young and could not quite remember it. Father reported that his mother had all of the information and provided her name and phone number on the record. The court ordered the department "to make further inquiries" of the paternal grandmother and both maternal grandparents.

On May 18, 2022, the juvenile court ordered K.H. detained from mother and father. Father's counsel objected to an offering of random drug testing, asserting that father's drug use was not part of the conditions which led to K.H.'s removal. The court noted, "There is a relationship between the substance abuse and the issues that brought the child before the Court, as [K.H.] came before the Court because [K.H.] was not in the care of parents and the Department alleges the parents were not providing proper protection, so sobriety is definitely an issue or may be an issue in determining what needs to happen for [K.H.] going forward."

Before making its orders regarding what services the department was to offer prior to disposition, the juvenile court asked the department to clarify why the recommended domestic violence assessment was appropriate. Counsel for the department responded that because the parents were aware of the sexual abuse allegations and did not take protective measures, "it would be in order [to determine] whether or not a child abuse intervention class would be appropriate." The court asked counsel for the department to "confirm on the record that it is the same screening for child abuse prevention that is

5.

incorporated in the domestic violence assessment," to which counsel for the department responded, "Yes.…"

The juvenile court indicated it was ordering the parents to be provided with a domestic violence assessment "[u]nderstanding … that assessment will also assess for whether or not a child abuse prevention program is needed." The court further ordered the department to offer parenting services, mental health and substance abuse assessments and recommended treatment, and random drug testing, with authorization for the department to accommodate father's medical condition.

The juvenile court found K.H. "may be an Indian child" as defined in ICWA and directed the department "to provide ICWA notice."

The department prepared a "NOTICE OF CHILD CUSTODY PROCEEDING FOR INDIAN CHILD" (ICWA-030) form. The form indicated K.H. is or may be eligible for membership in the Blackfeet, Cherokee, Choctaw, and/or Winnebago tribes. The form provided mother's biographical information and listed several potential tribes. Father's biographical information was also provided, but it indicated he and his family members were "Not Indian." The form indicated that on June 23, 2022, the department's ICWA liaison contacted mother, who informed the liaison that she had Blackfeet and Winnebago ancestry as well as either Cherokee or Choctaw ancestry. Mother provided familial lineage and "[n]o further extended family information was made available or identified in proceeding with the ICWA notice." As for father, the form indicated the liaison contacted him on June 24, 2022, and he stated he did *not* have any Native American ancestry and declined to provide any further information, claiming, "that is a matter of public record." Paternal grandmother was contacted and provided K.H.'s familial lineage to the best of her knowledge, and "[n]o further extended family [information] was made available or identified in proceeding with the ICWA notice." The ICWA-030 form was served on several tribes and the Bureau of Indian Affairs. The department received several responses from many of the tribes indicating that K.H. was

6.

not an Indian child within the meaning of ICWA based on the information provided in the ICWA-030 form.

The department's jurisdiction/disposition report dated June 16, 2022, indicated the parents reported mother had sole legal custody of K.H., and the parents had joint physical custody, with father having visitation. There was also a child support order for father. Mother had a lengthy child welfare history, with referrals dating back to 1999 regarding her older two children (K.H.'s half siblings), including a dependency proceeding which resulted in sole physical custody of her two older children being awarded to their father.

Father also had a history of referrals. In 2007, it was reported father was physically and emotionally abusive to mother's two older children. K.H. was listed as at risk of sibling abuse. The referral was listed as "unfounded" with no reason provided. In 2008, the department received a referral alleging emotional abuse and general neglect of K.H. It was reported mother and father engaged in a domestic violence incident that resulted in father pushing mother into a wall. The referral was listed as "unfounded" with a note that a section 300 hold was not being placed as K.H. would be staying with the maternal grandmother.

According to the department's search of the California Law Enforcement Telecommunications System (CLETS), neither parent had a criminal history. Father was employed and living in a studio apartment with his girlfriend; however, he asked her to move out so that K.H. could stay with him. He reported he would like K.H. in his care. He reported he would not be participating in voluntary services, as his attorney advised him he did not have to. When the social worker encouraged him to do so to show his efforts to reunify with K.H., he became argumentative and expressed it was possible that K.H. had not been abused. K.H. reported that he did not want to visit with mother but would like to visit with father.

On the day set for the jurisdiction/disposition hearing, June 22, 2022, father requested to set the matter for a contested hearing. He was contesting the jurisdictional allegations against him and requested for disposition that K.H. be placed in his care.

The contested hearing was conducted on September 16, 2022. The department called the social worker as part of its case-in-chief. The department was requesting father complete a domestic violence assessment because there was a history of father's relationship with mother being "unhealthy." K.H. remembered the parents not getting along. The domestic violence assessment was also the appropriate method to assess for an anger management class or child abuse intervention class, from which the department felt father could benefit. The social worker testified that father had shown aggression toward her by becoming defensive when certain topics arose; he would express that his civil rights were being violated and that department employees would lose their jobs. The social worker described an incident during visitation where a miscommunication between he and the department caused him to escalate into a more aggressive state with K.H. in the next room, to the point where the visitation had to be canceled. The social worker felt communication had improved between her and father and he had been more pleasant since she made up the visit that had been canceled.

The social worker further testified that the reason the department was requesting a substance abuse assessment and random drug testing was because father had a substance use history. She explained, "I know that he's brought up, you know, history years back. I don't know if it was in his adolescent time, young adult history there, but that's what he has brought up." When asked if father ever told her about any incidents with law enforcement he had regarding drugs, she responded, "You know, I do recall him saying something—some history there of being in trouble with a substance, but he didn't specify what it was exactly." She further testified that the department "just want[ed K.H.] to be in a healthy environment with a sober care provider." As of the date of the hearing,

8.

father had refused to do any random drug testing. The social worker did not have any reason to believe that father was not sober or used any illegal substances.

The social worker further testified father declined to allow the department to assess his home until the day before the hearing. Father's home passed the safety inspection, and the only outstanding issue was the background check of father's fiancée, which was being processed. K.H. had a good relationship with father's fiancée.

On cross-examination, the social worker testified that she had observed visits and they had gone fine, and K.H. has also reported that the visits had gone fine. She had not observed father being argumentative or defensive toward K.H. She believed father could provide care for K.H.

The emergency response social worker (ER social worker) who investigated the initial referral also testified on behalf of the department. The ER social worker testified that the department had requested random drug testing and a substance abuse assessment because at the TDM meeting father indicated he used marijuana regularly and did not submit to a spot drug test. The ER social worker had interacted with father four to five times and during those interactions he was "very aggressive verbally." Father accused the ER social worker of lying, would interrupt her, and overall was not cooperative. He threatened to "come after [her] job" if she "did not leave him alone." He yelled at her several times over the phone and threatened to file a restraining order if she continued to contact him. Her reason for contacting him was to provide information about services and the department's recommendations, and obtain information about his Native American ancestry. On multiple occasions, the ER social worker had to hang up the phone on father because he would repeat that he did not want to talk to her or would yell at her, and the conversation was not productive.

The ER social worker testified that the week earlier, prior to the previous hearing, she observed father displaying aggressive behaviors in the presence of K.H. She was about 15 feet away from him and observed him yelling at his attorney in the hallway

9.

saying he did not want to settle the case even if it resulted in K.H. being placed with him on family maintenance because he did not want to admit any sort of guilt, regardless of the outcome. K.H. was within earshot and looking down at the floor. The ER social worker attempted to engage K.H. in conversation, but K.H. appeared upset. The ER social worker clarified on cross-examination she had not seen father exhibit his aggressive behavior toward K.H., only in his presence.

The ER social worker testified the department "absolutely" had concerns regarding drug use due to his aggressive and erratic behaviors, as his inability to maintain his composure "could indicate substance use." When asked on cross-examination if there was any other evidence of substance use, the ER social worker responded, "Beyond his own statement of use, no." She had not observed him to be "under the influence as far as physical or physiological symptoms" and "[t]he only concerns that are possible indicators of substance abuse could be his erratic and aggressive behavior," as evidenced by his "[b]eing unable or unwilling to follow our conversation or listen to details of our conversations[; m]isrepresenting things that have been said to him and then accusing myself or our Department of lying to him[; a]nd just generally continuing to be uncooperative even during simple tasks like asking information about his Native American ancestry." K.H. had reported he believed mother used drugs but never reported he believed father used drugs.

Father testified on his behalf. He had problems communicating with the social workers because they "bold-faced lied" to him by telling him the juvenile court had ordered him to drug test. The reason he had not drug tested was because his medical condition made it difficult for him to give a urine sample. He testified he never told anyone from the department he currently uses marijuana. He told one of the social workers he used marijuana in his childhood and was a "current medical cannabis patient" due to having cancer and uses "edible[s]." He had a "ticket" for marijuana 15 or 20 years

10.

earlier but the marijuana belonged to a friend of his. He did not use any illegal substances and had not drunk alcohol in 21 years.

Father testified he was objecting to a domestic violence assessment "because in [his] 42 years of life [he had] never been arrested nor convicted of any crime that has to do with domestic in any way, shape or form." A restraining order was issued against him due to "a criminal act that was never committed that I never was arrested or convicted upon" between he and mother. He admitted he kicked the door in "on [his] own house that the locks had been changed on" and he "had a notice from [his] landlord that said [he] could enter [his] own home." He had never been convicted of any child abuse crime or any crimes dealing with anger issues.

Father further testified he was "more than capable" of providing care to K.H. and providing for K.H.'s needs. He worked 40 hours per week "every week for the last 15 years." He was willing to take a parenting class "as long as the County of Fresno decides they're going to pay for the financial responsibility of such" and do so "in a timely manner that it doesn't interfere with my financial work needs for my family." He felt the same way about a mental health assessment. Father testified he was a "[h]undred percent" willing and able to make arrangements for K.H. to attend any mental health counseling or other services, as well as doctor's appointments and school responsibilities. He testified he felt he and K.H. would benefit from family counseling because "[i]t's going to be a hard transition going from 16 years living in a drug-infested home to coming to a home that doesn't have those problems." He wanted to address any problems K.H. may have from that transition. He was willing to allow the department to make unannounced visits in the case that K.H. was placed with him.

The parties stipulated that K.H. felt safe with father and wished to return home to father.

After hearing argument, the juvenile court found the allegations in the dependency petition true and that K.H. was described by section 300, subdivisions (b), (c), (d), and

11.

(j).  The court further found that K.H. did not come within the provisions of ICWA.  The court removed K.H. from mother's physical custody.  The court noted it was unclear whether father was a custodial or noncustodial parent, but that under either analysis, it would be unsafe for K.H. to be placed in his care.  Mother was bypassed for reunification services pursuant to section 361.5, subdivision (b)(10.)  Reunification services were ordered for father, including "parenting classes, a domestic violence assessment and recommended treatment, substance abuse evaluation and recommended treatment, a mental health evaluation and recommended treatment, [and] random drug testing."

In explaining its ruling on the services it was ordering to be included in father's case plan, the juvenile court indicated it was ordering random drug testing for father based on his testimony that he uses marijuana and further on the behaviors described by the social workers that father was unable to maintain an appropriate demeanor twice in K.H.'s presence.  The court noted that neither the court nor the department was "able to determine the extent of that use or whether that use is, in fact, within a level that would allow the father to be a sober care … provider."  The court recognized that K.H. was almost 17 years old but he had suffered from mental health issues and had been sexually abused for nearly 10 years, and it was "essential that the Department is able to verify that there is [a] sober and protect[ive] parent," and father's "use or non-use of alcohol, marijuana and controlled substances would directly impact his ability to be proactive and protective of [K.H.]" and to "assess [K.H.] in h[is] mental health struggles."  The court concluded the department's request for a substance abuse assessment and recommended treatment and random drug testing was "entirely appropriate under the circumstances."

Regarding the domestic violence assessment and recommended treatment, the court noted the assessment was "the tool used in our county that will lead to revelation of whether a domestic violence program[,] … child abuse intervention program[,] … [o]r anger management program might be helpful to the parent."  The court noted there was "some evidence" of domestic violence, in that father testified there was a restraining

12.

order against him.  The court further noted there was evidence father was unable to maintain appropriate demeanor.

Finally, the court noted "the parenting class and random drug testing are directly ordered.  The other I'm ordering you to participate in the assessments.  I do not know if you do or do not need any treatment for domestic violence, substance abuse or mental health.  It is the assessment that would lead to that information for the Department."

The written case plan included a provision that father test negative on all drug tests.

## DISCUSSION

**I.     ICWA**

**A.      Relevant ICWA Provisions**

Under California's statutory scheme to comply with ICWA, the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child." [4]  (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court, rule 5.481(a).)  The child welfare department's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  "Under both ICWA and California law, ' "extended family member[s]" ' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or

---

[4]     An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.  (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

13.

stepparent.' " (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053; 25 U.S.C. § 1903(2); § 224.1, subd. (c).)

When the court or social worker has "reason to believe"[5] (but not sufficient evidence to determine there is "reason to know"[6]) that an Indian child is involved in a proceeding, "further inquiry regarding the possible Indian status of the child" is required. (§ 224.2, subd. (e).) Section 224.2, subdivision (e)(2) enumerates three duties of further inquiry: (1) interviewing the parents, Indian custodian, and extended family members to gather biographical information regarding the child; (2) contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying tribes with whom the child may be affiliated; and (3) contacting tribes, or any other person who may reasonably be expected to have information regarding the child's membership or eligibility for membership in a tribe. (§ 224.2, subd. (e)(2)(A)–(C).) "Contact with a tribe" for the purpose of the department's duty of further inquiry "shall, at a minimum,

---

[5] "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated" in section 224.2, subdivision (d)(1)–(6). (§ 224.2, subd. (e)(1).)

[6] These enumerated grounds for "reason to know" are: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [¶] [and/or] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d); see 25 C.F.R. § 23.107(c) (2021).)

14.

include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under [ICWA]" and "include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).)

If, after further inquiry is conducted, "the court, a social worker, or probation officer knows or has reason to know … that an Indian child is involved" in the dependency proceeding, notice shall be sent to the child's parents or legal guardian, Indian custodian, if any, and the child's tribe for any hearing that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement so the tribe may exercise its right to intervene. (§ 224.3, subd. (a); see 25 U.S.C. § 1912(a).)

Before finding ICWA inapplicable, the juvenile court must make a finding that the agency conducted "proper and adequate further inquiry" and exercised "due diligence" in doing so and that there is no reason to know whether the child is an Indian child. (§ 224.2, subd. (i)(2).)

## B.    Standard of Review

This court has adopted a hybrid standard of review for alleged ICWA inquiry errors.[7]  (*In re K.H.*, *supra*, 84 Cal.App.5th 566, 600–601.)  Under this standard, "[t]he first element [of a court's ICWA finding under section 224.2, subdivision (i)(2)]— whether there is reason to know whether the child is an Indian child" is a factual determination best reviewed for substantial evidence.  (*In re Ezequiel G.* (2022) 81

---

[7]    There is a split of authority among the Courts of Appeal regarding how to evaluate claims of ICWA inquiry error.  (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618 (*K.H.*) [summarizing the varied approaches].)  The Supreme Court has granted review on the issue in *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578.  Recently, this court decided *K.H.*, which articulates the standards we will apply until the Supreme Court provides additional guidance in *In re Dezi C.*

Cal.App.5th 984, 1004.) "The second element—whether a 'proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted'" should be reviewed for abuse of discretion. (*Ezequiel G.*, at pp. 1004–1005.)

In assessing prejudice stemming from an inquiry error, "the focus is on the missed opportunity to uncover relevant information necessary to make a reliable, informed determination concerning whether the child is or may be an Indian child." (*In re K.H.*, *supra*, 84 Cal.App.5th at 609.)

### C. Parties' Contentions and Analysis

Father contends the juvenile court erred in finding ICWA inapplicable because the department failed to discharge its duty of inquiry by providing the tribes incomplete information regarding K.H.'s extended family members.[8] Specifically, the ICWA-030 form (1) indicated father's relatives were "Not Indian" contrary to his report in court, and (2) omitted mother's representation in court that her father was adopted and had the possible family name of "Hazel" or "Nobal-Randal." Father also contends the department failed to contact K.H.'s extended family members for the purpose of obtaining more information.

---

[8] Father also asserts that the department did not provide adequate *notice* to the tribes. We note the record only supports a finding there was "reason to believe" K.H. was an Indian child, triggering the department's duty of further inquiry (§ 224.2). There is no evidence there was "reason to know" K.H. was an Indian child, which would trigger formal notice provisions (§ 224.3). We acknowledge that the ICWA-030 form is titled as a "notice," but it is commonly used to make contact with tribes under the department's duty of further inquiry to determine whether there is indeed "reason to know" a child is an Indian child, and that appears to be what happened here. To the extent father is suggesting there was formal notice error, we reject that claim, as at this stage in the proceeding, there was no duty of formal notice.

To be clear, we agree with father that further contact needs to be made with the tribes to provide more complete information, under the department's duty of *further inquiry*, either by way of an updated ICWA-030 form or other method identified by the tribes, so long as it is in compliance with section 224.2, subdivision (e)(2)(C).

16.

The department concedes that inquiry was not adequate and resulted in prejudicial error but disagrees as to the extent of the shortcomings. The department contends it should have interviewed maternal relatives named by mother and others who were available to it and followed up on mother's suggestion that her father was adopted off a reservation. The department contends, however, inquiry "on the paternal side … extended far enough" because it "went beyond Father" and "no further information was gained from the paternal grandmother."

We conclude the juvenile court's finding that an adequate ICWA inquiry had been conducted was an abuse of discretion and that the error was not harmless. We accept the department's concession as to inquiry regarding the maternal side. Regarding the paternal side, however, we reject the assertion that the inquiry "extended far enough." The information provided to the tribes was incomplete as it indicated father's relatives were "Not Indian" contrary to father's assertion in open court. We do not know, and will not presume, what effect this may have had on the tribes' determinations of K.H.'s status as an Indian child. The relevant tribe should be provided with the information that father provided in open court, particularly that his great-grandmother may have been a member.

As far as determining whether the department must interview other paternal extended family members before sending the updated information to the tribes, we consider that paternal grandmother appeared to be able to provide fairly complete biographical information for the paternal side of the family. We also consider, however, that at this early stage in the proceedings it does not appear K.H.'s interest in permanency would be affected by ensuring a more thorough inquiry, as well as that father's claim of Native American ancestry has been inconsistent, suggesting the department might benefit from gathering more information. Upon remand, the department should attempt to interview other paternal extended family members who may be able to assist in providing the most accurate and complete information to the tribes.

**II.     Challenged Portions of Father's Case Plan**

Section 362 authorizes the juvenile court to "direct any reasonable orders to the parents" of a dependent child as the court deems necessary and proper to ensure appropriate care, supervision, custody, conduct, maintenance, and support of the child including counseling or education programs. (§ 362, subds. (a) & (d).) "The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).) The reunification plan " 'must be appropriate for each family and be based on the unique facts relating to that family.' " (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1458.) The juvenile court has "broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion." (*In re K.T.* (2020) 49 Cal.App.5th 20, 25.) This discretion "permits the court to formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings." (*Ibid.*)

We review the juvenile court's disposition orders for an abuse of discretion (*In re I.R.* (2021) 61 Cal.App.5th 510, 522), reviewing factual findings underlying the orders for substantial evidence. (*In re K.T.*, *supra*, 49 Cal.App.5th at p. 25.)

**A.     Substance Abuse Assessment and Recommended Treatment/Random Drug Testing with a Provision in the Case Plan to Test Negative**

Father contends the juvenile court erred by ordering him to participate in random drug testing and a substance abuse assessment and recommended treatment as part of his case plan. We agree the order for random drug testing was an abuse of discretion but the order for a substance abuse assessment was reasonable.

Father cites several cases standing for the proposition that before a court orders direct substance abuse treatment/counseling or drug testing, there must be a basis on which to conclude the parent has a substance abuse problem. (See *In re Basilio T.* (1992)

4 Cal.App.4th 155, 172–173 [absence of evidence of a substance abuse problem was insufficient to support drug testing or substance abuse therapy component of reunification plan]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 770 [same, even when there is evidence the parent used medical marijuana]; see also *In re Sergio C.* (1999) 70 Cal.App.4th 957, 959, 960 [unreliable evidence that parent used and sold drugs not sufficient to justify a random drug testing order].) We agree that the state of the evidence at the time of the disposition hearing was insufficient to show that father had a substance abuse problem justifying the order of random drug testing.

Here, father had admitted to using medical cannabis edibles, and the department reported he indicated he used marijuana regularly. There was no evidence, however, that he *abused* marijuana or any other legal or illegal substance. The department's background check revealed no drug-related criminal history or child welfare referrals. Father admitted he received a "ticket" for someone else's marijuana 15 to 20 years earlier, which is not sufficient evidence on which to conclude father ever abused marijuana much less that he currently abused marijuana. Father had been employed full time consistently for 15 years and was able to pay child support and provide additional food and clothing for K.H. The social worker testified that she had no reason to believe father was not sober and no evidence that father used illegal substances. While the ER social worker suspected drug use based on father's admission of marijuana use and "erratic and aggressive" behavior, she had observed no "physical or physiological" symptoms of drug use. (See *In re Basilio T.*, *supra*, 4 Cal.App.4th at pp. 172–173 [social worker's observation of "out of the usual" behavior was not sufficient to base an order of drug testing and substance abuse therapy].) The social worker further testified that although K.H. was aware of mother's drug use, he had never indicated he suspected father used drugs.

In accord with the cases cited by father, because there was no basis on which to conclude father *abused* substances, an order for random drug testing, at the time the

19.

disposition order was made, was inappropriate. We note this opinion has no effect on any future order for drug testing, should the court later determine based on new evidence that such an order is necessary to protect K.H.

Turning to the juvenile court's order of a substance abuse assessment and recommended treatment, we first note the court expressly indicated it was not directly ordering substance abuse treatment, only the assessment that would inform whether treatment was needed. None of father's cited authority addresses this distinction. While we acknowledge there was not sufficient evidence to demonstrate father had a substance *abuse* problem, there was sufficient evidence he used at least marijuana. Even though marijuana is a legal substance, and father asserted he only used it for medicinal purposes, it can be abused. We make no comment as to whether evidence of use of a legal substance is sufficient to reasonably justify the order of a substance abuse assessment, as that is not the only factor we consider. We also must recognize the unique facts and circumstances surrounding K.H.'s dependency and his particular needs.

K.H. came under the juvenile court's jurisdiction in part due to serious emotional damage as evidenced by his experiencing depression and engaging in self-harm. We agree with the court that even though K.H. is an older child, given his emotional needs, it is "essential" he have a parent who has the ability to "be proactive and protective [and] to assess [K.H.] in [his] mental health struggles." K.H. had been severely negatively affected by mother's drug use and experienced trauma from that relationship as well as from the abuse perpetrated by his great-grandfather. Thus, the evidence that father used marijuana, paired with the circumstances that brought K.H. into dependency and his particular needs, justified the court's order of a substance abuse assessment.

In our view, a substance abuse assessment is a reasonable and less invasive alternative to random drug testing to address the court's and department's concerns in K.H.'s interest in having a sober care provider. It is possible father will participate in the substance abuse assessment, and no treatment will be recommended. However, if father

20.

participates in the assessment and treatment is recommended, such treatment is reasonably directly related to the protection of K.H., particularly his emotional needs. We note again that our analysis regarding drug testing is based solely on the state of the evidence at the time of the dispositional hearing, and we express no opinion on any drug testing that may be recommended as a result of father's substance abuse assessment.

For the reasons set forth, we conclude the order for random drug testing and requirement father test negative for all substances was an abuse of discretion. We find no error with regard to the court's order of a substance abuse assessment.

## B.     Domestic Violence Assessment and Recommended Treatment

Father also contends the court erred by ordering a domestic violence assessment and recommended treatment as part of his case plan. We disagree.

The court's order that father participate in a domestic violence assessment and recommended treatment was not an abuse of discretion as it is amply supported by the record. The record indicates that it was a domestic violence incident that caused the parents to part ways and ultimately resulted in K.H. being in the care of the maternal great-grandfather. Father admitted there was a restraining order issued against him for kicking a door in. He also admitted that one of the reasons he brought K.H. back to the maternal great-grandfather was because he was fearful of law enforcement getting involved based on past experiences of mother reporting violations of the restraining order. Father also stated to a social worker earlier in the proceedings that he was the victim of mother's domestic violence and attributed this as the reason he left K.H. with mother. Father's history with domestic violence was tied to his ability to protect K.H.

Further, the record discloses the main intent behind the order was to determine whether father was in need of child abuse intervention or anger management services. That father might benefit from child abuse intervention services was directly linked to jurisdictional findings pertaining to father, which was father's return of K.H. to his abuser and untimely report of K.H.'s abuse to law enforcement. The record also clearly

21.

indicated father might benefit from anger management services to become a better care provider for K.H. as evidenced by his behavior toward department employees and in the presence of K.H. The record supports an inference that father's anger prevented him from coming to a resolution with the department regarding the dispositional issues and obtaining placement of K.H. A domestic violence assessment, including screening for child abuse intervention and anger management services, was sufficiently related to father's ability to provide safe care for K.H.

For the foregoing reasons, we conclude the order of a domestic violence assessment and recommended treatment was not error.

## DISPOSITION

The portion of the juvenile court's disposition order ordering father to participate in random drug testing and test negative for all substances is reversed. The court's finding that ICWA does not apply is conditionally reversed. The matter is remanded to ensure compliance with ICWA inquiry provisions. In all other respects, the dispositional order is affirmed.